# Durr *v.* The State.

*Indictment for the Emission of Change Bills.*

1. *The statute intended to suppress illegal currency.*—The purpose of the statute (Code of 1876, ¿ 4433,) forbidding the emission of change-bills to circulate generally, as money, was intended to suppress the evils of an unauthorized paper currency.

2. *Every form of illegal currency is forbidden.*—The statute is not directed against paper of any particular form or character. If the purpose of its emission be, that it shall pass and circulate generally as money for an indefinite period, it falls within the statutory prohibition.

3. *Paper not transferable, is not violative of the statute.*—A paper which authorizes a person named in it to purchase goods on the credit of the drawer to a specified amount, and expresses on its face that it is not transferable, can not enter into general circulation as money, and is not within the purview of the statute.

[Durr v. The State.]

APPEAL from the Circuit Court of Autauga.

Tried before the Hon. JAMES Q. SMITH.

The indictment in this case was found by the grand jury of Autauga county, on the 23d day of October, 1877. It was in the following words and figures, viz: "The grand jury of said county charge that, before the finding of this indictment, John W. Durr caused, or procured to be made, written, signed, or countersigned, without authority of law, a certain paper in words and figures as follows, to-wit:

| 1 | 1 | 1 | 1 | 1 | 10 | 10 | 15 | 15 | 15 | 15 | 25 | 25 | 25 |
|---|---|---|---|---|----|----|----|----|----|----|----|----|----|
| 1 | | | | | | | | | | | | | 25 |
| 1 | | | | OCTOBER 17, 1877. | | | | | | | | | 25 |
| 1 | | | | | | | | | | | | | 50 |
| 1 | | LET *Hamp DeJarnette* have ½ ——————— | | | | | | | | | | | 50 |
| 1 | | Dollars trade at store. | | | | | | | | | | | 50 |
| 1 | | | | J. T. FLOYD. | | | | | | | | | 50 |
| 1 | 1 | | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 5 | 5 |

"Which said paper was caused or procured to be made, emitted, signed, or countersigned as aforesaid, for the purpose and with the intent that said paper should answer the purposes of money, or for general circulation, against the peace and dignity of the State of Alabama."

To this indictment the defendant demurred, and assigned the following causes of demurrer: *First*, "that the paper set forth in the indictment shows upon its face that it did not, and could not answer the purposes of money, or be for general circulation;" *second*, "that the indictment did not aver that the defendant made, or emitted, or caused to be signed, the paper set forth in the indictment, to answer the purposes of money;" *third*, "that the indictment does not aver that the paper set forth in the indictment was made, signed, emitted, or countersigned by the said J. T. Floyd, or any other person, or that the defendant caused said Floyd or any other person to sign, make, emit, or countersign said paper;" *fourth*, "that the causing or procuring to be made, emitted, signed, or countersigned, the paper set forth in the indictment for the purpose and with the intent that said paper should answer the purposes of money, or for general circulation, without more, is not a crime by the common law, or statutes of this State;" *fifth*, that causing the said paper to be signed, emitted, or countersigned, "for the purpose of

general circulation, without more, is not a crime by common law, or by the statutes of this State;" *sixth,* "that the paper set forth in the indictment shows upon its face that it is payable to a particular person therein named, and that it is not transferable; and causing such a paper to be made, emitted, signed, or countersigned, is not a crime by the laws of this State;" *seventh,* that the indictment is defective on account of its repugnancy; and *eighth,* that the indictment charges no crime against the defendant."

The court overruled the demurrer, and the defendant pleaded not guilty.

On the trial, evidence was introduced by the State which showed that the Lehman Manufacturing Company, of which the defendant was a member, owned and operated a cotton factory in Autauga county, and also owned a store; and that J. T. Floyd, whose name is signed to the paper, an exact copy of which is contained in the indictment, was book-keeper of the company, and a clerk in the store. He signed the paper which is mentioned in the indictment, and testified "that the defendant did not cause or procure" him to do so.

There was evidence that the Manufacturing Company employed from one hundred to one hundred and twenty operatives; and that, for the convenience both of the officers of the company and of the operatives, the defendant deposited at the factory a large number of papers in blank, similar to that described in the indictment. This was done to avoid the necessity of entering on the books of the company every article of merchandise sold to the operatives, and for the accommodation of the employees, who wished to anticipate their wages. The papers were issued only to the operatives of the factory. The words " not transferable " were written in red ink across the face of each paper so issued. No person except the employee to whom it was given, and whose name was written in it, had ever obtained, or could get any article of merchandise from the store, or " any thing else upon the said paper."

" The witness, Floyd, further testified, that the figures on the margin of said paper, from five to fifty, represent the number of cents; and the other figures, from one to five, represent dollars. When the person to whom said paper was given purchased any goods or merchandise, the numbers in the margin corresponding to the price were punched, and the paper handed back to such person, and when goods and merchandise had been purchased to the amount stated in said

paper, the paper was taken up and destroyed. The wages of the employees were payable monthly, and at the end of the month the balance of said wages was paid in money; and that said papers had never been issued to pay wages which were due; and none had ever been given or issued to any person unless he was an employee of the factory." This testimony was corroborated by other witnesses.

"The solicitor offered, on behalf of the State, to read in evidence to the jury, the said paper thus presented to said witness, but the defendant objected to its introduction, on the grounds: *First*, that there was no sufficient evidence that the defendant caused or procured said paper to be made, emitted, signed, or countersigned; *second*, that the said paper is not of the kind or character prohibited by the statute; *third*, that the defendant was authorized by law to cause or procure said paper to be made, emitted, signed, or counter-signed." The court overruled the objection, and permitted the said paper to be read in evidence to the jury; to which action the defendant excepted.

The defendant introduced the superintendent of the factory, who testified that he suggested to the defendant the preparation and use of the tickets or papers described in the indictment, and that the defendant objected, because he said it would violate the law. But to this testimony the solicitor objected. The court sustained the objection, and the defendant excepted.

The defendant introduced a witness who had been a practising lawyer for more than twenty years, and offered to prove that he had submitted the said papers to him in blank; and that the defendant said "his purpose was to save time and trouble, and to accommodate the operatives, as many of them were compelled to anticipate their wages; but in doing so, he did not wish to violate the law, and asked the advice and opinion of said attorney." To this evidence the State objected, and the court sustained the objection, and the defendant excepted.

Among other charges, the defendant asked the following instruction, in writing: "That a paper which is made, emitted, signed, or countersigned, for the purpose or with the intent that no other person shall use said paper in any way whatever, than the person to whom said paper was made payable, and to effect this purpose the paper is made not transferable, then said paper is not made, emitted, signed, or countersigned, for the purpose or with the intent to answer the purposes of money, or for general circulation; and if the

jury believe from the evidence that the defendant caused or procured the paper read in evidence, for the purpose, and with the intent that said paper should be alone used by the person to whom it was made payable, and by no other person, and for no other purpose, and with no other intent, then the jury must acquit the defendant." The court refused to give the charge, and the defendant excepted.

CLOPTON, HERBERT & CHAMBERS, for the appellant.

JOHN W. A. SANFORD, Attorney-General, for the State.

BRICKELL, C. J.—The indictment is founded on the statute (Code of 1876, § 4433), which prohibits the making, emission, &c., without authority of law, of any paper to answer the purposes of money, or for general circulation. The original statute, from which this section of the Code was taken, was enacted as part of the Penal Code of 1841. Clay's Dig. 435-6. But a short time prior to its enactment, the Supreme Court of the United States had decided, and the decision had been followed by this court, that banking in this State, in all its ramifications, was a common law right belonging to the citizen, unrestrained by the constitution or existing laws.—*Bank of Augusta v. Earle,* 13 Peters, 519 ; *Nance v. Hemphill,* 1 Ala. 551. The statute was intended to serve a two-fold purpose—that of restraining individuals from exercising the function of banking, which consists in the issue of paper to answer the purposes or to circulate as money—and to suppress the mischiefs of an unauthorized paper currency passing by delivery as money. Such a currency, especially of low denominations, in times of financial distress, when the authorized or chartered banks had suspended specie payments, and the smaller coins were withdrawn from circulation, had been introduced, and the community often suffered from the irresponsibility of those by whom it was issued. This currency was of various forms and characteristics. Sometimes bearing all the appearances of a bank-note, yet payable only in bank-notes, and redeemable only when a sufficient number of the notes to amount to a particular sum were presented. Sometimes payable to bearer, or to a particular person or bearer, and sometimes without a payee. It also often assumed the form of a ticket declaring that it was good for a particular sum in merchandise. If the statute had been directed against paper of a particular form, paper in the nature of bank-notes, it would

[Durr v. The State.]

not have been adapted to the suppression of the evils from which the community had suffered. It is not therefore directed against paper of any particular form or character. Without regard to its form or character, if the purpose of its emission is that it shall pass and circulate as money—in the language of the statute, *answer the purposes of money*— it falls within the statutory prohibition.—*Barnett v. State*, 54 Ala. 579. When we say answer the purposes of money, we mean the purposes for which bank-notes are issued; that of entering into the transactions of business, and passing current as money for an indefinite period. Such we regard is the real meaning of the statute. Bills of exchange, promissory notes, bills single, checks, bonds, all answer some of the purposes of money. They are given and accepted in the payment of debts, in the purchase of property, and serve many of the purposes of money; yet they do not fall within the prohibition of the statute, unless intended for general circulation—intended not to answer the purposes of money with a particular individual, in a particular transaction— but to pass current as money in all the general transactions in which money may be used. It is only when they are so intended, and so used, that they are capable of working the mischief to the community against which the statute intends to guard.

The paper now in question, in form and legal effect, is a mere authority personal to the individual named in it to purchase goods on the credit of the drawer, to the amount of fifty cents. The negotiability of the paper is destroyed by the words, *not transferable*, written across its face, if in any event it was negotiable. These words prevent its transfer, or the delegation of the authority it contains. Such a paper can not do the office of money—can not enter into general circulation; can not pass by delivery; can not be changed or converted from a mere authority personal to the individual named·in it, and is not within the purview of the statute. The demurrer to the indictment should have been sustained. This conclusion renders it unnecessary to consider any other question presented by the record.

The judgment is reversed, and a judgment will be here entered discharging the appellant from further prosecution.